Norbert Winig v. Commissioner.
Winig v. Commissioner
Docket No. 16273.
United States Tax Court
1950 Tax Ct. Memo LEXIS 278; 9 T.C.M. (CCH) 101; T.C.M. (RIA) 50037; February 10, 1950
*278 Where petitioner's wife, with former business experience, conceived the idea for the product which was to be produced by the business involved, which business was in her name; supplied the entire initial capital and certain thereafter required capital borrowed on her personal credit; performed certain services; and controlled the policies of the business; held, that it was the intention of the wife to, and she did, establish and thereafter was the owner of a small glove business and that petitioner, her husband, is not taxable on the net income of the business because of certain managerial participation by him in the business. Alfred D. Dennison, Esq., Masonic Bldg., Johnston, N. Y., for the petitioner. Whitfield J. Collins, Esq., for the respondent. TYSON Memorandum Opinion TYSON, Judge: The respondent determined a deficiency in petitioner's income tax for the calendar year 1943 in the amount of $6,872.13. The year 1942 is also involved in computation of the deficiency because of the forgiveness feature of section 6 of the Current Tax Payment Act of 1943. The only question presented is whether respondent erred in determining that the entire net profits *279 of the business conducted under the successive names of A. Winig and Winig Glove Company were taxable as income to the petitioner for the years 1942 and 1943. Findings of Fact The petitioner, an individual residing at Gloversville, New York, filed his income tax returns for the calendar years 1942 and 1943 with the collector of internal revenue for the fourteenth district of New York. In and before 1940 petitioner was engaged in business in New York City under the name of Winig & Company, Inc. Petitioner's wife, Auguste Winig, was employed at a Fifth Avenue shop as a hat designer and milliner and prior to that time had, for five or six years, assisted her mother in operating a millinery business in Vienna, Austria. Petitioner's business proved unsuccessful, and, although he did not go into bankruptcy, he had outstanding liabilities resulting from the business at the time of its termination. These liabilities were completely discharged subsequent to 1944. Because his business was unsuccessful, petitioner moved to Gloversville, New York, in 1940, and obtained employment at $35 per week with the glove manufacturing firm of R. Antevil & Company, a business solely owned by R. Antevil. *280 He remained in that employment until the late spring or early summer of 1941. His main duties with Antevil & Company were designing and selling. Auguste Winig saw no future in her husband's job with R. Antevil & Company and throughout his employment by that company had been anxious to go into business herself. She recently had seen "bunny mittens" advertised in a national woman's magazine and thought such an item, which was new in the glove industry, should have good sales possibilities. The bunny mitten is a glove in which there is one space for all fingers except the thumb and a separate space for the thumb. The outside of the glove is composed of fur and the inner side of leather or cloth. Auguste interested petitioner, who had had no previous experience with bunny mittens, in presenting the idea to Antevil & Company. That company acted on the idea by producing bunny mittens in the fall of 1940 for the Christmas trade. The success of Antevil & Company in producing mittens convinced Auguste that her idea was a sound one; and while petitioner was still working for Antevil & Company she decided to go into the business on a "contract basis"; and in July 1941 the business was started *281 under the name of A. Winig. To obtain capital to initiate the business Auguste borrowed $550 on a ring, earrings, and brooch which had been given her by her mother. Approximately $200 of this amount was used in initiating the business, the remainder being used for the family's living expenses. At about the time the business was started Auguste's second child was born so that she was not then able to devote any actual physical work to the business. About six weeks after her second child was born in July 1941, Auguste was able to take an active physical part in the work of the business. She would go to the factory every day, tacking the gloves, turning them, examining the finished product for faults therein, and doing a part of the mending and packing. When Auguste's mother, who lived with the Winigs and took care of the children, developed heart trouble and died, Auguste was no longer able to spend as much time in the business as she had theretofore done, but at all times thereafter she spent about one hour each day at the place of the business. She continued to exclusively control the checking account of the business from its beginning until October 1942 when a power of attorney *282 was given petitioner to also sign checks on that account. She at all times involved directed the policy as to what should or should not be done by the business; and at all times she consulted with petitioner about every aspect of the business. Petitioner resigned his position with R. Antevil & Company in June 1941 shortly before the business of A. Winig was started and when that business was started he began to work for it. He negotiated the lease at $10 per month for part of a floor space which had tables upon which the sewing machines to be used in the business could be placed. During the operation of the business petitioner secured the supplies, consisting of threads and needles; packaged the merchandise; and prepared the checks for expenses for Auguste's signature. Also, he distributed the material furnished by the manufacturers among the machine operators; delivered the finished product to the customers; and prepared the pay rolls. The business was at first operated on a "contract basis"; that is to say, it received the cut material furnished by the customer and sewed that material together into the finished bunny mittens. The only machinery owned at the inception of the business *283 and until December 1942 when the hereinafter mentioned power press was purchased, was from eight to ten sewing machines of a total value of between $300 and $400. In August, September, and December 1941 additional funds were obtained for the business by personal loans from Frank Antevil, the son and an employee of the owner of R. Antevil & Company, to Auguste Winig. These loans totaled $264 and were repaid in 1942. Before the business of A. Winig was begun, Auguste had obtained assurances from Frank Antevil of his willingness to advance such small sums as the business might require, together with assurance of his aid in seeing that the contract business which R. Antevil & Company was placing would be given to the new business of A. Winig. After the initiation of the business some moneys were advanced by parties for whom the business was doing contract work. In 1942 A. Winig began purchasing the necessary materials and manufacturing the mittens on its own account. The additional machines required were borrowed from R. Antevil & Company, who had a considerable number of idle machines. In October 1942 the name of the business was changed from A. Winig to the Winig Glove Company; and *284 by certificate signed and sworn to by Auguste Winig on October 29, 1942, and filed in the office of the clerk of Fulton County, New York, Auguste Winig stated that she intended to conduct business under the name and style of Winig Glove Company; and that the true and full name of the person intending to transact the business was Auguste Winig. About this time the location of the business was changed. Auguste signed the lease for the new premises. In the latter part of 1942 Auguste came to the conclusion that the business was losing money by having materials it used cut outside of its own place of business and that it could save money if a power press, which would cut the material in layers, similar to the one used to cut material with which she had been familiar in her New York employ, could be obtained. Auguste accompanied by petitioner went to New York and bought a power press, financing the purchase in part by a note and chattel mortgage for $601 given on January 16, 1943 to the Fulton County National Bank and Trust Co. of Gloversville, each being signed "Auguste Winig d.b. as Winig Glove Co." The power press was thereafter used in the business. On Auguste Winig's 1943 income *285 tax return the machinery and equipment of the business was listed at $3,071.80. In 1942 the machinery and equipment had a value of approximately $570. The income from the business was approximately $4,900 in 1942. In 1943 the income of the business increased substantially, and was $31,021.63. Petitioner received no salary from the business in 1941 and 1942, as the income was deemed too small to warrant his being paid a salary. So much of the business income for those years as was used to defray the family's living expenses was considered by both his wife and petitioner as petitioner's compensation in these years. In 1943 when the income of the business increased substantially, petitioner demanded and received a salary of $7,500. He actually drew and used this amount and paid income tax thereon. In December 1943 Auguste and petitioner formed a partnership after petitioner asserted that he would take a job elsewhere if Auguste did not agree to divide the income of the business. However, Auguste retained complete ownership of the assets of the business and continued to exercise the right to draw money from the business account, sign checks, and to be consulted and advised about the *286 affairs of the business. Opinion The question in this proceeding is whether the 1942 and 1943 income of the business successively known as A. Winig and Winig Glove Company is taxable to petitioner as respondent contends or is taxable to Auguste Winig as petitioner contends. The effect upon taxability of the 1943 income of the partnership agreement entered into in December of that year has not been raised by the parties and consequently is not here in issue. Because of the almost infinite possibilities that intrafamily arrangements offer for shifting the incidence of taxation by beclouding the issue of who has earned the income, we have come to disregard such arrangements where we deem them more nominal than real. To determine whether we are dealing with substance or mere form in such instances, we must seek the true intent of the parties as disclosed by the evidence before us. The Supreme Court has recently stressed the necessity of this determination in family partnership cases. In , it is said: "* * * The question is * * * whether, considering all the facts - the agreement, the conduct of the parties in execution of its *287 provisions, their statements, the testimony of disinterested parties, the relationship of the parties, their respective abilities and capital contributions, the actual control of income and the purposes for which it is used, and any other facts throwing light on their true intent - the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise. * * *" Likewise, in the instant case, where the husband is directly and the wife is indirectly concerned, we must decide from the evidence whether Auguste Winig truly intended to establish and operate and did establish and operate the business involved herein as her own or whether the business was intended to be by both petitioner and his wife, in reality, that of petitioner although nominally that of Auguste. The following facts shed light on the true intent of the parties: Auguste furnished the small capital required for the inception of the business and all the outside capital thereafter required through borrowings made by her from Frank Antevil and the Fulton County National Bank and Trust Co.; Auguste had previous business experience both in her mother's millinery establishment *288 and in her New York employment; the idea for getting out the product "bunny mittens", as did the impulse to establish the venture, originated with Auguste; she devised the plan of first doing business on the "contract basis" and secured in advance assurances of aid from Frank Antevil; she conceived the idea of purchasing the power press and decided on its purchase; she performed personal services in the place of business in the fall of 1941 and thereafter spent one hour there almost every day; she had absolute control of the checking account of the business until October 1942 when she empowered petitioner to also check on that account; and throughout all the period involved she consulted with petitioner about every aspect of the business and directed the policy of the business. All these enumerated facts lead us to the conclusion that Auguste was the true and sole owner of the business involved and entitled to the income therefrom and that respondent erred in taxing the net income of the business to the petitioner. We have reached the above conclusion notwithstanding that the services performed by petitioner as shown in our findings indicate that he managed the actual mechanical *289 operations of the business as distinguished from making decisions as to policy of and the financing of the business. But we think that such management entrusted to petitioner by the wife, was not incompatible with the real ownership of the business by her. Cf. . In support of his position that petitioner is taxable with the net income from the business respondent cites ; ; ; ; ; ; [reversed, . All these cases are clearly distinguishable on their facts. Decision will be entered for the petitioner.